**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **J. B. HANKS CO., INC.** | **CIVIL ACTION NO: 97-CV-0040** |
| **VERSUS** | **JUDGE JACKSON** |
| **SHORE OIL COMPANY** | **MAGISTRATE JUDGE RIEDLINGER** |

---

## REPORT AND RECOMMENDATION

I.    Introduction

The undersigned, serving as Special Master pursuant to an Order dated March 20, 2013 (Doc. 156) (the "Appointment Order"), respectfully submits the following as his Report and Recommendation in this matter.

This matter was tried before the Honorable Ralph E. Tyson, United States District Judge, on January 12 and 13, 2004, and was taken under advisement.  Judge Tyson died on July 18, 2011, prior to rendering a decision in this action.

Counsel for the parties to this suit, in consultation with Judge Jackson, determined that the most expeditious and efficient manner of concluding this litigation (without the necessity of re-trying the case) was to appoint a Special Master in accordance with the provisions of Rule 53 of the Federal Rules of Civil Procedure. Accordingly, the Appointment Order was entered, whereby the undersigned was appointed as Special Master, and the undersigned undertook to comply with the directives and requirements of the Appointment Order and of the cited Rule of the Federal Rules of Civil Procedure.

In order to discharge his duties under the Appointment Order, the Special Master has carefully reviewed and studied those items described in Paragraph c of the Appointment Order, and has conducted such legal research as he deemed necessary and appropriate.

II.    Discussion of Underlying Facts[1]

Defendant, Shore Oil Company ("Shore" or "Seller"),[2] was the owner of certain working interests[3] in certain mineral leases in the Lockhart Crossing Field in Livingston Parish, Louisiana (the "Field").  Shore also owned certain royalty interests and overriding royalty interests in the Field.[4]

The nature of the business of plaintiff included the acquisition and sale of oil and gas mineral interests, including producing oil and gas properties.[5]  In the Spring of 1994, J. B. Hanks, principal of plaintiff, J. B. Hanks Co., Inc. ("Hanks" or "Purchaser"),

_____

[1]     This Part of the Report and Recommendation is intended to present a narrative of the salient facts pertaining to this controversy, and is not intended to be a comprehensive listing of material facts.  The failure to mention a distinct fact in this Part is not material as Part IV sets forth the Special Master's Proposed Findings of Fact.

[2]     While Shore was named as the sole defendant in the petition, Doc. 1, p. 5-9, by Order issued on March 9, 2002, Doc. 94, 3TEC Energy Corporation was substituted as party defendant "in the place and stead of Shore Oil Company."  At the opening of the trial, Judge Tyson granted an unopposed motion to substitute PXP Gulf Coast, Inc., as the proper party-in-interest, as successor to Shore.  Doc. 131.  Nevertheless, in this Report and Recommendation, the defendant is referred to as "Shore."

[3]     "The term 'working interest' is synonymous with the extent of a lessee's 'lease-hold interest' in a tract or subsurface geological strata thereunder."  *Pinnacle Operating Company, Inc. v. ETTCO Enterprises, Inc.*, 40,367 (La.App. 2nd Cir. 10/26/05); 914 So.2d 1144, 1146, fn. 1.

[4]     Tr. I p. 18, l. 4-17.  The trial occurred on January 12 and 13, 2004.  The transcript for each day of trial commenced with Page 1.  In order to distinguish in references to the "Tr." (transcript), the pertinent day of trial is indicated with I (January 12, 2004) or II (January 13, 2004).

[5]     Tr. I p. 133, l. 12-15; p. 166, l. 16-23.

initiated contact with Shore to inquire if the latter had any interest in disposing of its interest in the Field.[6]   Shore's President, Steve W. Herod, responded positively to the overture by Mr. Hanks, and discussions and negotiations ensued thereafter.

At the inception of negotiations, the parties entered into a Confidentiality Agreement.[7]   Subsequent thereto, a more specific Confidentiality Agreement was executed by the parties in order to explicitly allow Hanks to review information relative to the marketing of natural gas, but obligated Hanks to maintain the confidentiality of the information provided.[8]   Ultimately, the parties entered into a Purchase and Sale Agreement dated July 25, 1994 (the "PSA").[9]

As will be noted by reference thereto, the PSA provided for a closing of the transaction contemplated thereby to occur on September 9, 1994.[10]  The Purchase Price for all of the assets was set at $450,000.00.[11]  As is common and customary, the PSA had further provisions for the adjustment of the Purchase Price for a variety of reasons.

Article I(c) of the PSA delegated to the purchaser, Hanks, the responsibility to "deliver to Seller in writing a schedule . . . allocating the Purchase Price among the various individual properties comprising the Assets in a manner consistent with their

---

[6]     Tr. I p. 17, l. 22-5; p. 18, l. 1-3.

[7]     Exhibit P-2.

[8]     Exhibit P-3.

[9]     Exhibit P-10; Exhibit D-32.

[10]     The typed date of August 26, 1994, was interlined by the parties and changed to September 9, 1994, and then initialed.  The Closing Date eventually was set for October 7, 1994.  Exhibit P-26.

[11]     PSA, Article I(c).  Exhibit P-10; Exhibit D-32.

respective values."[12]  The purpose of such an allocation is to serve as the basis of any reduction in the Purchase Price as might be necessitated by the "due diligence" conducted by the purchaser.[13]  This allocation was accomplished on August 5, 1994.[14]

Certain Assets covered by the PSA were subject to "preferential rights to purchase" held by third parties.[15]  This necessitated the issuance to such third parties of a written notice of Shore's intention to sell the affected Assets, and offering the holders of those preferential rights the opportunity to preferentially purchase such assets on the same terms as Shore had agreed to sell to Hanks.[16]  The "preferential right to purchase" was exercised and the assets were withdrawn from the anticipated sale,[17] resulting in a reduction of the Purchase Price for the remaining assets to $437,500.00.[18]

---

[12]     *Id*.

[13]     "This allocation of value is then used to determine the value of properties affected by title defects, for purposes of preferential right notices, tax purposes, and other purposes in the agreement."  Steven B. Richardson, Oil and Gas Acquisitions, Rocky Mountain Mineral Law Foundation Part IIIB2 (1995)

[14]     Exhibit P-12.

[15]     A "preferential right of purchase" is akin to a "right of first refusal" as envisioned by Louisiana law.  See, *e.g*., Articles 2625-26, Louisiana Revised Civil Code.  See also *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388 (5th Cir. 2006); Harlan Albright, *Preferential Right Provisions and their Applicability to Oil and Gas Instruments*, 32 Sw. L. J. 803, n. 3 at 803; Harry M. Reasoner, *Preferential Purchase Rights in Oil and Gas Instruments*, 46 Tex.L.Rev. 57, 72 (1967); Jeffrey J. Scott, *Restrictions on Alienation Applied to Oil and Gas Transactions*, 31 Rocky Mtn.Min.L.Inst., 15-1, 15-27 (Section 15.06) (1985).

[16]     PSA, Article V.  Exhibit P-10; Exhibit D-32.

[17]     Exhibit P-18.

[18]     Tr. I p. 35, l. 7-20.

4

An important part of an agreement such as the PSA is the right of the purchaser to conduct a "property review."[19]   Relevant portions of the PSA[20] are, as follows:

> Seller shall allow Purchaser access to examine title and the documents listed in Article IX which relate to the leases described in Exhibit "A" at Seller's office in Houston.  Seller, however, will be under no obligation to bring abstracts or title opinions up to date.  Purchaser shall notify Seller no later than twelve noon, central time, July 27, 1994, of any defects in title or percentage interest, which are discovered by Purchaser and which relate to any Assets not subject to preferential rights to purchase.   Purchaser shall have fourteen (14) days from the receipt of written notification from Seller advising that third parties holding preferential right to purchase all or a portion of the Assets have declined or failed to timely exercise such right or rights to examine title and the documents listed in Article IX which relate to the leases previously affected by such preferential rights to purchase.   No later than 5:00 p.m. central time, on the fourteenth (14th) day following receipt of such notification by Purchaser, ***Purchaser shall notify Seller of any material defects in title, percentage interest, or deficiency in the Documents discovered by Purchaser.***   THE ABSENCE OF ANY SUCH NOTICE SHALL BE DEEMED A WAIVER OF SUCH DEFECTS, IF ANY, BY PURCHASER.  For the purposes of this paragraph, a defect shall be considered "material" only if it will cost in excess of $5,000.00 to eliminate such defect.  Within ten (10) days after receipt of timely notice of a material defect, Seller may take any steps it believes are reasonable in attempting to eliminate such material defects, ~~but Seller shall be under no obligation to cure any alleged material defect~~.[21]   However, Seller may agree to (1) remedy the material defect, (2) agree with

---

[19]     In the industry, this process of "property review" is often termed "due diligence."

[20]     PSA, Article IV(a).  Exhibit P-10; Exhibit D-32.

[21]     Words in a contract which are deleted, erased or stricken by the contracting parties are to be deemed as though not written in the first instance.  See, e.g., *Dawson v. Ohio Oil Co.*, 153 La. 657, 96 So. 508, 509 (1923), the Supreme Court construed a donation and noted that certain words had been "erased from the original, and hence form no part thereof."

Purchaser on an adjustment to the purchase price which shall reflect Purchaser's cost to remedy such defect, or (3) remove the Asset affected by such defect from the Assets being conveyed and adjust the purchase price accordingly; provided, however, if at any time the cumulative costs to remedy all defects and deficiencies together with the cumu-lative allocable value of all defects and deficiencies which appear to be incurable exceed twenty percent (20%) of the Purchase Price, either Seller or Purchaser may terminate this Agreement and neither party shall be obligated to close. (Bold italicized emphasis added.).

Pursuant to the PSA, Hanks undertook to conduct the "due diligence" envisioned thereby.  The purpose of "due diligence" is to afford an opportunity for a purchaser, such as Hanks, to review the books and records maintained by the Seller, and otherwise inspect the properties to be sold, for the purpose of satisfying itself as to the condition of the property, both environmentally and as a matter of title.  Said differently, in the oil and gas industry, a purchaser agrees to a stated price which it is willing to pay for the assets, but is afforded an opportunity to conduct such review of relevant and material information as it deems necessary or appropriate in order to satisfy itself that the price to which it has agreed is a price which it is willing to pay for the assets as they are represented by the Seller.[22]

_____

[22]　　To illustrate, a seller will typically "represent" to the purchaser that it owns a 100% working interest, to which relates, say, a 75% net revenue interest.  The working interest, or "WI," is the basis on which costs and expenses are incurred and borne (the owner of a 100% working interest pays *all* – 100% -- of the costs and expenses), and the net revenue interest, or "NRI," is the amount of revenue which accrues and relates to the working interest (and out of which such costs and expenses are to be paid).  In the simplest of cases, the NRI is typically 100% minus the lessor's royalty as well as any other burdens on the revenue, if any.  If, despite the represented interests, the seller actually owns only, say, 70% net revenue interest, the purchaser will justifiably insist upon a reduction in the purchase price since it would still be responsible for *all* of the costs and expenses allocable to the 100% working interest, but would have a lesser amount of revenue (the actual 70% rather than the represented 75%) out of which such costs and expenses would be paid.  The principal – but not exclusive – purpose of "due

As noted above, the PSA provided that the Purchaser would have until "twelve noon, central time, July 27, 1994," within which to notify the Seller if, as a consequence of its "due diligence," the Purchaser contended that there was a problem or discrepancy which constituted a "material defect[] in title, percentage interest, or deficiency in the Documents discovered by Purchaser."  "For the purposes of [the PSA], a defect shall be considered 'material' only if it will cost in excess of $5,000.00 to eliminate such defect."[23]

In connection with its "due diligence," Hanks wrote a letter to Shore requesting information as to "all pertinent royalty interest payments" made by Shore "from 7/1/93 through 6/30/94," with respect to the mineral leases which are the subject of the PSA.[24]

By letter dated September 13, 1994,[25] Shore provided "an accumulation of all the various interests, lease interests, listed on the exhibit to the [PSA] just total[ed] by

---

diligence" is to confirm the correctness of the numbers or interest as represented by the seller to the purchaser in the purchase and sale agreement.

[23]     PSA, Article IV(a).  Exhibit P-10; Exhibit D-32.

[24]     Exhibit P-19.

[25]     Exhibit P-21.

well."[26]  At about the same time, the period of time within which Hanks might conduct its

"due diligence" was extended through September 27, 1994.[27]

Although the interest to be sold by Shore included several mineral leases

(and other interests), the principal point of discussion in connection with the "due dili-

gence" was focused on one particular mineral lease -- the "Miley Lease," as amended.[28]

Thus, as characterized by counsel for Hanks, the Miley Lease was the "primary focus of

[the] lawsuit."[29]  Indeed, the Miley Lease was stated to be the "largest working interest"

held by Shore "in terms of entitlements to volumes of gas" in the Field.[30]

While the Miley Lease was executed on a commercial printed form, it was

amended in a way that made it "more difficult or more onerous in that it places greater

payment burdens, more accounting burdens on the working interest owner or the

Lessee than [one] would find in a pre-printed standard form lease."[31]  As amended, the

Miley Lease provided for either (a) a Lessor's royalty of forty-eight (48%) per cent or (b)

---

[26]     Tr. I p. 41, l. 6-14.  The record reveals no written response to this request, but the testimony suggests that Hanks had access to this information as it was provided some information by Amoco.  Tr. I p. 53, l. 3-23.  Additionally, Shore offered to allow Hanks to have access to its records on several occasions.  See, e.g., Exhibit P-29.  Finally, Exhibit P-26 indicates that Shore provided Hanks "with royalty payment records for one mineral lessor for each of the producing wells involved in the contemplated transaction," on the basis of which Hanks was able to articulate its objection.

[27]     Exhibit P-23.

[28]     Exhibit P-24.

[29]     Tr. I p. 37, l. 10.

[30]     Tr. I p. 28, l. 19-25; p. 29, l. 1-4.

[31]     Tr. I p. 43, l. 18-22.

a net profits interest of fifty-five (55%) per cent, determined on a quarterly basis,[32] whichever is the greater.[33]

In connection with its "due diligence," Hanks determined that Shore had been paying the Lessors under the Miley Lease on an "entitlements" basis, rather than on a "actual takes" basis.[34]

In the industry, these matters -- the amount of gas which a working interest owner is *entitled* to take, as well as the amount actually *taken* by such owner – are called "entitlements" and "actual takes," respectively.[35]  A party's "entitlements" are determined by multiplying the party's working interest times the amount of natural gas actually produced in a particular month from the relevant well.  In contrast, a party's "actual takes" are the amount of natural gas which is actually received by such party, which may be more or less than such party's "entitlements" in that month.

---

[32]    The amendment to the Miley Lease provides that the NPI is to be calculated and "measured on a quarterly basis, . . . (beginning with that quarter commencing December 1, 1982 and ending February 28, 1983)."  Exhibit P-24.  The parties referred to this as a "freeze frame quarter," not a "carry forward or carry back" quarter.  Tr. I p. 49, l. 4-8.

[33]    At all relevant times, the net profits interest, or "NPI," represented a greater return to the Lessor than the royalty, so at issue in the case is the methodology of the net profits interest (rather that, properly speaking, the royalty interest).  All references herein to "royalties" should be understood as a reference to the NPI contemplated by the amendment to the Miley Lease.

[34]    Tr. I p. 40, l. 7-11.

[35]    Tr. I p 135, l. 6-25.  See, generally, *Pogo Producing Co. v. Shell Offshore, Inc.*, 898 F.2d 1064 (5th Cir. 1990); *Ellwood Oil Co. v. Anderson*, 26,907 (La.App. 2nd Cir. 5/10/95); 655 So.2d 694, *writ denied* 95-1485 (La. 10/6/95); 661 So.2d 466 and *Amoco Production Company v. Fina Oil & Chemical Company*, 95-1185 (La.App. 1st Cir. 2/23/96); 670 So.2d 502, *writ denied* 96-1024 (La. 5/31/96); 673 So.2d 1037.

To the extent that a party "actual takes" more than its "entitlements," that party is said to be "over-produced."[36]  Correspondingly, to the extent that a party "actual takes" less than its "entitlements," that party is said to be "under-produced."[37]

Plaintiff held certain interests in the Field[38] and, hence, had a general understanding of the Field and received certain reports from Amoco, the operator of the Field, with regard to revenue and expenses associated with production from the Field, including the amount of gas which a working interest owner is entitled to take, as well as the actual amount taken by such owner.[39]

After discussions concerning the royalty issue raised by Hanks were not assuaged by agreement between representatives of Shore and Hanks, Hanks' lawyer wrote a letter to Shore's Mr. Herod and stated that Hanks contended that "the failure to pay your mineral lessors on gas actually produced and sold is a default under the terms of *each and every lease*."[40]  (Emphasis added.).  The letter stated further that "*[e]ach and every one of your mineral lessors* would be legally correct in providing you with a written demand to pay royalties on the gas produced and sold, and, upon your failure to

---

[36]  See *Hunt Oil Company v. Batchelor*, 93-3144 (La. 10/17/94); 644 So.2d 191, 194, fn. 1.

[37]  *Id.*, fn. 2.

[38]  Tr. I p. 182, l. 10-19.

[39]  Tr. I p. 137, l. 1-25, p. 138, l. 1-8; Tr. I p. 182, l. 20-25, p. 183, l. 1.

[40]  Exhibit P-25.

make such payments would be entitled to penalties and/or cancellation of the leases pursuant to the Louisiana Mineral Code."[41]  (Emphasis added.).

By letter dated September 27, 1994,[42] counsel for Hanks informed Shore that the failure of Shore to provide certain royalty information constituted "a deficiency in document production required pursuant to the provisions of the [PSA]."  This letter further stated that, should Shore fail to provide the requested information, Hanks "is ready, willing and able to close on the [PSA] and shall proceed to closing pursuant to the terms of the agreement on Friday, October 7, 1994, which is ten (10) days from the date of this notification."  It further stated that, unless the requested information was provided in a timely fashion, "it will be necessary for J. B. Hanks Co., Inc. to escrow a portion of the sales price, which in the sole opinion of J. B. Hanks Co., Inc., shall be sufficient to pay the correct royalties owed through the effective date of the agreement."[43]

C. Randall King, Esq., of Porter & Hedges, L.L.P., a Houston, Texas, law firm engaged by Shore, responded to the letter dated September 23, 1994,[44] from

---

[41]     *Id*.  It was not until October 4, 1994, that Hanks indicated that the royalty issue (originally stated to pertain to "each and every lease" in the Field) pertained *only* to the Miley Lease.  Exhibit P-30.

[42]     Exhibit P-26.  One notes that this date is the extended date for the assertion of Title Defects.

[43]     *Id*.  See Articles 137-42, Louisiana Mineral Code, which set forth the procedure for the assertion of a claim by a lessor for unpaid or improperly paid royalties, including the necessity for a written notice of non-payment as a prerequisite to dissolution of the mineral lease.

[44]     Exhibit P-25.

counsel for Hanks.[45]   Therein, Shore denied "that payment of royalties based on 'entitlements' constitutes a breach of any of the leases at issue."   It also called to the attention of Hanks' counsel the Gas Balancing Agreement,[46] and reminded Hanks that it was expected "to comply with the Gas Balancing Agreement and all other such agreements after the closing of the pending transaction."[47]

Also, by letter dated September 27, 1994,[48] counsel for Hanks reiterated that "Shore is currently in default on *all of the mineral leases* which form the subject assets of the [PSA]."  (Emphasis added.).  This letter also reiterated Hanks' position that "those royalties due through the effective date of the agreement shall be paid by Shore Oil Company, Inc. and therefore must be deducted from the amount paid to Shore at closing."[49]   Finally, this letter asserted that the Gas Balancing Agreement was essentially "irrelevant" to the issues being raised by Hanks.[50]

By letter dated September 30, 1994,[51] counsel for Shore rejected the contentions of Hanks, and stated that Shore was "prepared to proceed to closing but is not willing to permit Hanks to deduct any amount from the agreed purchase price with respect to the royalty issues Hanks alleges to exist."   The letter also stated a willingness

---

[45]    Exhibit P-27.

[46]    Exhibit D-2.

[47]    Exhibit P-27.

[48]    Exhibit P-28.

[49]    *Id.*

[50]    *Id.*

[51]    Exhibit P-29.

to "re-open the review period for that specific purpose for a reasonable time to permit Hanks to review the records in Shore's offices."

Further correspondence between the parties ensued wherein the parties, in essence, "agreed to disagree."[52]  In particular, by letter dated October 6, 1994,[53] counsel for Shore demanded "that Hanks close in accordance with the terms of the [PSA] for all properties (less, of course, properties where preferential rights were exercised) without adjustment to the Purchase Price."

Finally, by letter dated October 7, 1994,[54] Shore agreed "to extend the closing date until Tuesday, October 11, 1994," and also proposed to reduce the Purchase Price by $25 thousand "as a complete settlement of all of our differences."

When, despite this interchange of correspondence, the parties could not reach agreement, Hanks filed a suit for specific performance in the 21st Judicial District Court, Livingston Parish, Louisiana, on October 7, 1994, at 3:29 o'clock P.M.[55]  Prior thereto, Shore filed a Petition for Declaratory Judgment and Damages against Hanks in the District Court of Harris County, Texas, on October 7, 1994, at 2:15 o'clock P.M.[56]  In other words, Shore beat Hanks to the court house by one hour and 14 minutes.

---

[52]     See, *e.g.*, Exhibits P-30, P-31 and P-32.

[53]     Exhibit P-31.

[54]     Exhibit P-33.

[55]     Exhibit P-35.

[56]     Exhibit P-37.

Counsel for Hanks provided a copy of its suit to counsel for Shore by letter dated October 7, 1994.[57]  In that letter, it was asserted by Hanks' counsel that Shore "has two (2) options to conclude this matter," describing them, as follows:

1.      Shore may elect to remove the Miley Lease (and well) from the transaction, and close on the remaining properties; or

2.      Shore may elect to close on all properties, including the Miley Lease (and well), "with the payment of any royalty due on oil and gas produced and sold under the various leases through the effective dated of July 1, 1994 to be paid at closing, out of the proceeds of the sale."

Subsequent to the filing of these lawsuits, the parties entered into a "Standstill Agreement" for a period of time until November 16, 1994.[58]  As stated in a letter dated November 1, 1994,[59] the purpose of this standstill arrangement was to allow the parties "to continue to attempt to resolve the situation in some way that is acceptable to both" of the parties.  Further correspondence ensued between the lawyers for the parties, resulting in a more formal Standstill Agreement dated November 14, 1994.[60]  Ultimately, Hanks agreed to dismiss its pending suit and further agreed to not file a new suit seeking specific performance "without first giving Shore advance written notice of Hank's intent to institute such lawsuit, and then only on the second

---

[57]      Exhibit P-34.

[58]      Exhibit P-39.

[59]      *Id*.

[60]      Exhibit P-46.

business day after the receipt of such notice by Shore."[61]   The term of the Standstill Agreement was stated to end "Wednesday, November 30, 1994 at 5:00 p.m. CST."[62]

Communications between Shore and Hanks seemingly remained dormant for a period of time.[63]   However, between November 1995 and June 1996, an exchange of correspondence ensued between Robert L. Cabes, Esq., of the Milling Benson law firm, on behalf of the Lessors under the Miley Lease, and Shore and its counsel, Porter & Hedges, relative to the proper methodology of calculation of royalty or net proceeds due to the Lessors under the Miley Lease.[64]   Mr. Cabes, on behalf of the Miley Lessors, made inquiry as to the methodology of royalty calculations and was provided information as requested.   In particular, by letter dated May 10, 1996, Shore furnished to Mr. Cabes a "worksheet which details the sales method for the 48% royalty and 55% net profits, [and] compares those figures to the royalties and net profits paid under the entitlements method."[65]   This spreadsheet reflected that, had Shore calculated the NPI for the quarter in question on an "actual takes" basis, rather than on an "entitlements" basis, the Miley Lessors would have received $86,000 "and some change."[66]   According

---

[61]     Exhibit P-48.

[62]     Exhibit P-46.

[63]     There appears to be no correspondence between the parties after the date of November 9, 1995, Exhibit P-48, until Hanks' counsel informed Shore and its counsel that the instant suit was to be filed, on or about December 17, 1996.  Exhibits P-49 and P-50.

[64]     See Exhibits P-52 through P-64

[65]     Exhibit P-59.

[66]     Tr. I p. 91, l. 24-25, p.92, l. 1-13; p. 152, l. 2-5.

to the spreadsheet prepared by Shore, the difference was calculated to be $86,386.00.[67]

By letter dated December 17, 1996, counsel for Hanks informed Shore that it intended to "reinstitute legal proceedings in the Twenty-First Judicial District Court, Parish of Livingston, State of Louisiana seeking specific performance of the Agreement of Purchase and Sale."[68]

Thereafter, Hanks filed a suit for specific performance against Shore on December 19, 1996, under Civil Docket No. 78255, 21st Judicial District Court, Livingston Parish, Louisiana.[69]

In its suit, Hanks seeks specific performance of the PSA and a judgment "ordering Shore to transfer title to the mineral interests to Hanks and/or declaring Hanks to be the owner of the mineral interests."[70]   The suit was removed to this Honorable Court on January 17, 1997.[71]

III.   <u>Legal Analysis</u>

A.   **<u>Preface</u>:**

The PSA envisioned an assignment of the mineral leases which comprised the "Assets" under that agreement.   At the outset, it is appropriate to note

---

[67]   Exhibit P-59, Bates No. 0000021 (bottom of page).

[68]   Exhibit P-50.

[69]   Doc. 1, pp. 5-9.

[70]   Doc. 1, p. 9 of 9.

[71]   Doc. 1, pp. 1-3.

that mineral leases are real rights,[72] and are classified as immovable property.[73]   "The [assignment] of a mineral lease is manifestly the sale of an incorporeal thing or right."[74] "The transfer of ownership or an interest in a mineral [lease] cannot be the subject of a verbal agreement; it must be evidenced by a written contract and cannot be proved by parol evidence."[75]

Consequently, with limited exceptions, all laws pertinent to immovable property apply to mineral leases and the sale or assignment thereof.[76]

At its core, this suit presents a matter of contractual interpretation in order to determine the rights and obligations of the parties under the PSA.  It is, therefore, appropriate to review a few of the fundamental principles of contractual interpretation.[77]

The rules of interpretation establish that, when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit.[78]

Courts are bound to give legal effect to all contracts, according to the true intent of the parties, and the intent is to be determined by the words in the contract

---

[72]     Article 16, Louisiana Mineral Code.

[73]     Article 18, Louisiana Mineral Code.

[74]     *Tomlinson v. Thurmon*, 189 La. 959, 181 So. 458 (1938).

[75]     *Billingsley v. Bach Energy Corporation*, 588 So.2d 786 (La.App. 2nd Cir. 1991).

[76]     See Patrick S. Ottinger, *What's in a Name?  Assignments and Subleases of Mineral Leases Under Louisiana Law*, 58 ANN. INST. ON MIN. LAW 283 (2011).

[77]     The following are adapted from Patrick S. Ottinger, *Principles of Contractual Interpretation*, 60 Louisiana Law Review 765 (Spring 2000).

[78]     *Maloney v. Oak Builders, Inc.*, 256 La. 85, 235 So.2d 386 (1970); *Cashio v. Shoriak*, 481 So.2d 1013, 1015 (La. 1986).

when they are clear and explicit and lead to no absurd consequences.[79]

Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom.[80]

"'Freedom of contract' signifies that parties to an agreement have the right and power to construct their own bargains. . . . In a free enterprise system, parties are free to contract except for those instances where the government places restrictions for reasons of public policy."[81]

B.    **General Discussion of Purchase and Sale Agreements:**

Purchase and sale agreements come in many forms, but they often have common characteristics and a common purpose.    The purpose and import of a purchase and sale agreement, such as the PSA involved herein, was characterized by one Commentator,[82] as follows:

> The basic purpose of the purchase agreement is to set forth with sufficient clarity the understandings of the parties about the transaction so that either party will be able to protect its rights in court if the other party terminates without cause. The typical purchase agreement thus should accurately

---

[79]    Articles 2045 and 2046, Louisiana Revised Civil Code; *Foret v. Louisiana Farm Bureau Casualty Insurance Company*, 582 So.2d 989, 991 (La.App. 1st Cir. 1991); *Ransom v. Camcraft, Inc.*, 580 So.2d 1073, 1077 (La.App. 4th Cir. 1991); *Massachusetts Mutual Life Insurance Company v. Nails*, 549 So.2d 826, 832 (La. 1989); *Borden, Inc. v. Gulf States Utilities Company*, 543 So.2d 924, 927 (La.App. 1st Cir.), *writ denied* 545 So.2d 1041 (La. 1989); *Schroeter v. Holden*, 499 So.2d 309, 311 (La.App. 1st Cir. 1986).

[80]    *Kean v. Lemaire*, 451 So.2d 151, 153-54 (La.App. 1st Cir. 1984).

[81]    *Louisiana Smoked Products, Inc. v. Savoie Sausage and Food Products, Inc.*, 96-1716, 96-1727 (La. 7/1/97); 696 So.2d 1373, 1380.

[82]    Phillip R. Clark, *Producing Property Acquisitions Legal and Practical Considerations*, Sw. Leg. Found. Inst. Oil & Gas L. & Taxn. Vol. 37 §9.03 [1] p.9-7.

describe the oil and gas properties and other assets being sold, set the price and effective date of the transaction, and describe any other economic terms of the agreement, such as when and how the purchase price is to be paid.

The purchase agreement also provides the framework for how the parties will get to the closing. It allocates responsibility for the tasks that must be accomplished before, closing, such as obtaining consents and preparing various closing documents.  If the parties have particular items of concern such as significant ongoing operations or litigation, the agreement should set forth how those items will be handled prior to closing, and it should also set forth the various conditions that must be satisfied before each party is obligated to close.  The agreement will also set forth a projected date for closing, the circumstances for extensions of that date, and an outside date by which closing must occur or the agreement terminates.

The final major area of the purchase agreement establishes the relationship of the parties after the closing by setting forth terms of indemnification, obligations to maintain and provide access to records and other post-closing obligations.

## C.    Is the Assertion of Alleged Improper Payment of Royalties a "Defect in Title":

Under the PSA, Hanks had a period of time until September 27, 1994,[83] within which to notify Shore of the existence of any problem or discrepancy which constituted a "material defect[] in title, percentage interest, or deficiency in the Documents discovered by Purchaser."  The issue first presented is whether the letter dated September 27, 1994,[84] from Hanks' counsel validly asserted and properly identified a "material defect[] in title, percentage interest, or deficiency in the Documents discovered by Purchaser."  The Special Master deems it to be conducive to a proper

---

[83]    Exhibit P-23.

[84]    Exhibit P-26

understanding and consideration of this threshold issue to examine each of these three in inverse order.

1.      "Deficiency in the Documents."

While Hanks, through its counsel, contended that the royalty issue constituted a "deficiency in the Documents discovered by Purchaser," the royalty issue put forth by Hanks – as to the proper methodology to calculate and pay the royalty and NPI under the Miley Lease -- is not of that character.

While the term "Documents" is capitalized, it is not actually defined in the PSA as a defined term.  That term is, however, modified in the first sentence of Article IV(a), as follows:

> Seller shall allow Purchaser access to examine title and the documents *listed in Article IX which relate to the leases described in* <u>*Exhibit "A"*</u> . . . (Italicized emphasis added.).

Thus, while not defined, the "Documents" as to which Purchaser, pursuant to its "due diligence," might raise objection – or assert as being deficient – are those to which reference is made in Article IX.[85]

That article of the PSA is entitled "Post-Closing Obligations," and identifies the following as Documents to which Purchaser, pursuant to Article IV(a) of the PSA, is entitled to have access for purposes of its right to conduct "due diligence," to-wit:

> . . . copies of records, documents, division order files, title files, abstracts, supplemental abstracts and certificates of

---

[85]      It is also noted that Seller "has made no representations or warranties as to the accuracy or completeness of such information or as to its title to the Assets, and entering into and performing this agreement, Purchaser has relied upon its independent investigation of and judgment with respect to the Assets, their value, and Seller's title thereto."  PSA, Article IV(b). Exhibit P-10; Exhibit D-32.

> title, title opinions, surveys, agreements, contracts, and other
> similar materials in the possession of Seller, if any, relating
> to operation or ownership of the Assets . . .

It is apparent that the intrinsic character of the Documents (a) to which Seller is obligated to provide access to Purchaser during the "property review;" (b) of which Purchaser is entitled to receive copies after Closing, and (c) which might be asserted by Purchaser as being deficient [for purposes of Article IV(a)], are documents which are, by their very nature or import, pertinent or relevant to a determination of title. Conversely, none of the identified class of Documents relates to the proper methodology for the payment of royalties, or the calculation thereof.

Additionally, even assuming that the term "Documents" encompassed royalty information, as noted in the first full grammatical paragraph of Page 2 of Exhibit P-26, Hanks ultimately received the information necessary to ascertain the manner in which royalties were calculated, thereby resolving or clarifying the deficiency, if any there be.

The Special Master does not consider the matters asserted by Purchaser to encompass a "deficiency in the Documents" within the contemplation of the PSA.

2.      "Percentage Interest."

There was no testimony directed to or suggestive of the notion that Shore did not own the stated interest in the Miley Lease or that its interest was not as represented on the Ownership Interest Summary for each well.[86]   Hence, no party

---

[86]      Ex. P-21.

contended that there was any defect or deficiency in the "percentage interest" held by Shore.[87]

3.    "Defect in Title."

Having eliminated the foregoing, the sole question remaining is whether the asserted facts pertaining to the proper methodology of calculation or determination of the payment due in respect of the net profits interest under the Miley Lease, constituted a "material defect[] in title."

While the term "title defect" (or, as stated in the PSA, a "defect[] in title"), is not defined, it is the opinion of the Special Master that, treating it as a "word of art,"[88] this term has reference to matters or imperfections in the title documents which could conceivably impair the record ownership or title of the Seller in the Assets covered by the PSA.  Certainly, in that sector of the oil and gas industry which is concerned with the purchase and sale of producing oil and gas properties, the common sense meaning of this term would have reference to defects in the ownership of the asset in a sense that, unless cured or rectified, would render the title to be unmerchantable.

It is, therefore, necessary to consider Louisiana law on the issue of merchantability of title to immovable property.

**D.    <u>Merchantable Title as Applied to Mineral Leases</u>:**

---

[87]    <u>See</u> footnote 22 herein for an illustrative discussion of a proper application of an error in "percentage interest."

[88]    "Words of art and technical terms must be given their technical meaning when the contract involves a technical matter."   Article 2047, Louisiana Revised Civil Code.  <u>See</u> *Lloyds of London v. Transcontinental Gas Pipe Line Corporation*, 101 F.3d 425 (5th Cir. 1996) (court resorted to the "industry's definition of the term" in order to determine a term's meaning).

Merchantable title is one that can be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and questions involved.[89]  Title is unmerchantable when it is suggestive of litigation.[90]  "Merchantable" implies something less than a perfect title and permits defects that are not reasonably liable to result in assault.[91]  When there is a reasonable possibility that a third person has an outstanding claim to all or part of the property, the title cannot be considered merchantable.[92]

To render a title unmerchantable because of outstanding claims of third persons, the claims must be substantial in nature thereby subjecting the purchaser to serious litigation.[93]  "A title does not become unmerchantable simply because a reputable attorney might question certain aspects of it as imperfect."[94]

Under Louisiana law, a title to property is merchantable when the title "can be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and apprised of the questions involved."[95]  Although the title need not be free from every technical defect, suspicion, or possibility of litigation, it must be "free of rational substantial doubt to the extent that a purchaser should feel that he can

_____

[89]     *Young v. Stevens*, 209 So.2d 25, 27 (La. 1967); *Parker v. Machen*, 567 So.2d 739 (La.App. 2nd Cir. 1990).

[90]     *Marsh v. Lorimer*, 164 La. 175, 113 So. 808 (1927).

[91]     *Langford Land Co. v. Dietzgen Corp.*, 352 So.2d 386, 388 (La.App. 4th Cir. 1977).

[92]     *Schaub v. O'Quin*, 214 La. 424, 38 So.2d 63, 65 (1948).

[93]     *Kay v. Carter*, 243 La. 1095, 150 So.2d 27, 29 (1963).

[94]     *Pesson Plumbing and Heating Co. v. Hammonds*, 160 So.2d 769, 772 (La.App. 3rd Cir. 1964).

[95]     *Deleon v. WSIS, Inc.*, 31,602 (La.App. 2nd Cir. 2/26/99); 728 So.2d 1046, 1049.

hold his purchase in peace without the probability of attack and with reasonable assurance that it will be readily salable on the open market."[96]   "Title does not become unmerchantable merely because litigation is possible, but only when the title is reasonably suggestive of future litigation."[97]

Illustrations of defects which render a title to immovable property unmerchantable would include the following,[98] to-wit:

1.   An outstanding mortgage or lien on property whose amount is greater than the amount of the sale renders title unmerchantable.[99]

2.   Inadequate property description may render title unmerchantable.[100]

3.   Outstanding contracts to sell may render title unmerchantable.

   a.   Title is unmerchantable when a contract to sell property has been entered into after a prior contract to sell the same property was executed.[101]

   b.   Previous contract of sale appearing on conveyance certificate renders title unmerchantable.[102]

4.   Pending litigation may render title unmerchantable.

   a.   Title is unmerchantable where pending litigation does not directly affect title of property being sold but potentially

---

[96]   *Id*.

[97]   *Bart v. Wysocki*, 558 So.2d 1326, 1328-29 (La.App. 4th Cir. 1990).

[98]   Many of the examples are derived from Paul A. Strickland, *Merchantable Title and the Mineral Lease*, 40 ANN. INST. ON MIN. LAW 236 (1993).

[99]   *Treadaway v. Williams*, 163 So.2d 911 (La.App. 4th Cir. 1964).

[100]   *Bossier v. Shell Oil Co.*, 430 So.2d 771 (La.App. 5th Cir. 1983).

[101]   *Marsh*, cited at footnote 90, *supra*.

[102]   *Zatzkis v. Fusilier*, 398 So.2d 1284 (La.App. 4th Cir.), *writ denied* 405 So.2d 533 (La. 1981).

affects access to the property being sold.[103]

> b.   Litigation directly concerning property to be sold affects merchantability.[104]

5.   Unfulfilled resolutory condition may render title unmerchantable.[105]

The concept of unmerchantability has been applied to the purchase and sale of mineral leases[106] in several cases, including the following:

1.   Title is unmerchantable when it is suggestive of litigation.[107]

2.   When there is a reasonable possibility that a third person has an outstanding claim to all or part of the property, the title cannot be considered merchantable.[108]

3.   To render a title unmerchantable because of outstanding claims of third persons, the claims must be substantial in nature thereby subjecting the purchaser to serious litigation.[109]

4.   "Merchantable" implies something less than a perfect title and permits defects that are not reasonably liable to result in assault.[110]

5.   Title does not become unmerchantable "even though the transferee's attorney questions certain aspects of the title and advises against the transfer."[111]

---

[103]   *Solar General Contractor. Ltd. v. Urban Redevelopments, Inc.*, 345 So.2d 558 (La.App. 4th Cir. 1977).

[104]   *Buzbee v. Fidelity National Bank*, 492 So.2d 15 (La.App. 1st Cir.), *writ denied* 497 So.2d 1003 (La. 1986); *Lake Forest, Inc. v. Bon Marche Homes, Inc.*, 410 So.2d 362 (La.App. 4th Cir. 1982).

[105]   *Buzbee,* cited at footnote 104, *supra.*

[106]   "A mineral [lease] is an incorporeal immovable."   Article 18, Louisiana Mineral Code.

[107]   *Sanders v. Rudd*, 427 So.2d 1271, 1275 (La.App. 2nd Cir. 1983).

[108]   *Id*.

[109]   *Id*.

[110]   *Toler v. Pacific Int'l Petroleum, Inc.*, 465 So.2d 925, 927 (La.App. 2nd Cir.), *writ denied* 468 So.2d 1210 (La. 1985).

[111]   *Id*.

The following testimony by Lambert M. Laperouse, Esq., who was presented as an expert witness by Shore, is concordant with these observations:

> Q.   I'm going to ask you, Mr. Lambert (sic), for you to assume for our purposes here today that the royalties were underpaid on the Miley Lease.  I'm not asking you whether you agree with that or not, just assume that the royalties were underpaid; is that a title defect?
>
> A.   It's not really a title defect.  It could gravitate to that under the most extreme circumstances.[112]
>
> *        *        *
>
> Q.   In your opinion is the royalty issue a title issue?
>
> A.   Royalty issue is an obligation issue.  If the lease is owned in a certain way, and if Shore owns it of record in the courthouse, so then presumably they have good title.  . . .  Whether they have maintained all of the obligation (sic) under that contract or not is an obligation issue, and that's usually covered in a different way in a different provision of an agreement.[113]

The following factors or considerations would also support the proposition that the asserted royalty issue is not a "defect in title."

First, the Miley Lease, as amended, did not explicitly specify that the royalties or NPI must be calculated using a particular method.  This omission both justifies and necessitates a resort to industry practices and usages.[114]  In that regard,

---

[112]   Tr. II p. 39, l. 7-13.

[113]   Tr. II p. 40, l. 9-16.

[114]   "It is well settled that custom of the place and the usual and customary manner of fulfilling like contracts is persuasive in determining the intention of the parties under a contract not specific in its wording."  *Par-Co Drilling, Inc. v. Franks Petroleum Inc.*, 360 So.2d 642 (La.App. 3rd Cir. 1978).

the expert witnesses for Hanks and Shore, respectively, agreed that the payment of royalties on the basis of "entitlements" is "acceptable in the industry,"[115] and is actually the "recommended" way to pay royalties.[116]

Next, the Lessors of the Miley Lease were either sophisticated in oil and gas matters, or certainly had sophisticated legal representation who examined and scrutinized this particular issue.  At no time did the Miley Lessors issue a notice of non-payment of royalties or otherwise avail themselves of available legal remedies, even though they (and their counsel) were provided all necessary information by Shore.

Where there is a legitimate dispute between the lessor and the lessee relative to a clause in the lease and there are grounds for honest doubt as to the rights of the parties, the Louisiana Supreme Court has declared that it "**has not, and will not, penalize a litigant lessee by dissolving a lease** held technically in default when there is a *bona fide* defense."[117]  (Emphasis added).

Thirdly, even if payment of royalties or the NPI on an "entitlements" basis was not proper, the continued receipt by the Miley Lessors, without complaint, of proceeds on this basis (particularly with actual knowledge of the issue) could be viewed

---

[115]    Tr. I p. 206, l. 16-19;

[116]    Tr. II p. 112, l. 6-19.   Mr. Berghammer, expert witness presented by the defendant, also stated his opinion that "entitlements is a very reasonable, and accurate, and fair method for computing royalties under this particular lease, and that that method should be applied consistently."  Tr. II p. 126, l. 9-12.

[117]    *Rudnick v. Union Producing Co.*, 209 La. 943, 25 So.2d 906, 908 (1946).

as an acquiescence in such methodology of payment or, certainly, an interpretation of the contract under the doctrine of "course of conduct."[118]

Most importantly, viewed in the worst light, a suit by the Miley Lessors (which never materialized) for non-payment of royalties would probably result in the assessment of monetary damages rather than dissolution of the Lease. Dissolution of a mineral lease for improper payment of royalties (even assuming it was improper) is a disfavored remedy.[119] In fact, Paragraph 7B to the amendment to the Miley Lease contained an arbitration clause whereby any dispute thereunder would be arbitrated, rather than litigated, with the further limitation that the decision of the arbitrators "shall be limited to a money judgment to the extent possible."[120]

As Hanks was focused on its concern that, in its view, the net profits interest had not been properly paid under the Miley Lease during the three-month period comprised of December 1993 through February 1994,[121] it also recognized that the issue would be resolved if any potential claim by the Miley Lessors prescribed. In

---

[118]    "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." Article 2053, Louisiana Revised Civil Code. See also *Davis v. Laster*, 242 La. 735, 138 So.2d 558 (1962) (The Supreme Court found it equitable to consider that lease provisions had been modified by mutual consent where the lessor had accepted delay rental payments for nine years when shut-in payments were due.).

[119]    "In a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice." Article 141, Louisiana Mineral Code.

[120]    Exhibit P-24. The arbitration clause further states that, while "the decision of the arbitrators is to be limited to a money judgment to the extent possible, they will have the authority to render any decision which a court might do pursuant to the law of Louisiana."

[121]    Tr. I p. 59, l. 14-19.

Louisiana, the liberative prescriptive period for a claim for unpaid royalties is three (3) years.[122]   In fact, the filing of the suit by Hanks closely approximated the lapse of that prescriptive period pertinent to the calendar quarter in issue.[123]

It is telling that the Miley Lessors never filed a lawsuit nor even issued a notice of non-payment of royalties, despite the fact that its counsel (who is well versed in oil and gas matters) engaged in a significant exchange of correspondence with Shore.  Indeed, Mr. Cabes' last letter to Shore stated, as follows:

> Insofar as the method of paying royalties is concerned, we believe that as long as the lessee is consistent, such royalties may be paid either on the basis of entitlements or actual sales.  However, it is our firm belief, based upon my own intention in drafting the lease amendment, that net profits should be calculated and paid on the basis of actual profits for a particular period.   I would appreciate your response directed to that issue.[124]

---

[122]   "The following actions are subject to a liberative prescription of three years:  An action to recover underpayments or overpayments of royalties from the production of minerals, provided that nothing herein applies to any payments, rent, or royalties derived from state-owned properties."   Article 3494(5), Louisiana Revised Civil Code.   See also *Board of Commissioners of Caddo Levee District v. Pure Oil Co.*, 167 La. 801, 120 So. 373 (1929); *Parker v. Ohio Oil Co.*, 191 La. 896, 186 So. 604 (1939) (". . . the royalties due under the lease were in the nature of rents and for that reason an action to recover them was prescribed by three years, as provided in [then] Article 3538 of the Civil Code.") and *Hankamer v. Texaco, Inc.*, 387 So.2d 1251 (La.App. 1st Cir.), *writ granted* 392 So.2d 669 (La. 1980), *case dismissed* 403 So.2d 651 (La. 1981) ("Therefore the claims for unpaid royalties accruing more than three years prior to the filing of the suit are prescribed.").

[123]   As explained by Mr. Hanks:  "I wanted [to] close on the property.  I still wanted to close on the property.  I hadn't dropped -- as you know, we were waiting trying to figure out what the resolution was going to be.  But when we didn't reach a resolution in '95, I simply said we have got one more year and this thing will resolve itself if nothing happens, if the Mileys don't initiate -- if the Mileys would initiate something it still wouldn't resolve itself by that resolution and we could sue for them to close."  Tr. I p. 160, l. 1-9.

[124]   Exhibit P-64.

Finally, in any event, Hanks had no occasion to be concerned about the issue of the payment of royalties or NPI owing under the Miley Lease prior to the Effective Date.[125]  This is so because the responsibility for the payment of royalties prior to the Effective Date would rest with Shore such that Hanks would be protected and indemnified therefrom, if the issue ever arose (which it did not).

Hence, Article VI(d) of the PSA reads,[126] as follows:

> All accounts payable, royalties, severance taxes and other costs and expenses with respect to the Seller's interest in the Assets which relate to the period prior to the Effective Date shall be the obligation of and be paid by Seller, and those which relate to the period commencing with the Effective Date shall be the obligation of and be paid by Purchaser.

Thus, even if Hanks were correct that the NPI had not been properly paid in respect of the quarter in question, Shore was responsible to rectify, post-closing, any such claim, should it arise.  This is reinforced by the provisions of the PSA whereby it is provided that "Seller shall retain all risk and liability of whatsoever nature connected with operations conducted on the Assets up to and including the Effective Date and agrees to indemnify, defend and hold Purchaser harmless from all liabilities, penalties, claims, causes of action, demands, lawsuits, and expenses associated with the operations up to and including the Effective Date."[127]

---

[125]    "The effective date of this purchase and sale shall be July 1 1994 at 7:00 a.m. local time for all purposes, including apportionment of revenues, expenses and production (hereinafter referred to as the 'Effective Date')."  PSA, Article I(a).  Exhibit P-10; Exhibit D-32.

[126]    Exhibit P-10; Exhibit D-32.  Arrangements of this type are often called "my watch, your watch."  Tr. II p. 12, l. 5-6.

[127]    PSA, Article VI(a).  Exhibit P-10; Exhibit D-32.

The Special Master concludes that the assertion by Hanks of an alleged issue associated with the manner in which the net profits interest was paid under the Miley Lease, does not constitute a "defect in title."

**E.      The Purchaser was Obligated to Close in Accordance with the PSA:**

By letter dated September 27, 1994,[128] Hanks first raised the notion – expressed in mandatory terms[129] – that the parties close the transaction, with an "escrow [of] a portion of the sales price, which in the sole opinion of J. B. Hanks Co., Inc., shall be sufficient to pay the correct royalties through the effective date of the agreement."

This suggested resolution evolved to a requirement, as contended by Hanks, that "the royalties due through the effective date of the agreement" "must be deducted from the amount paid to Shore at closing."[130]

Finally, the resolution proposed by Hanks was that "the payment of any royalty due on oil and gas produced and sold under the various leases through the effective date of July 1, 1994 to be paid at closing, out of the proceeds of the sale."[131]

Thus, these suggested mechanisms evolved, over a period of ten (10) days, from an escrow of funds, to reduction of the Purchase Price (seemingly with no concomitant payment of royalties allegedly due), to a payment of royalties to the Miley Lessors.

---

[128]      Exhibit P-26.

[129]      ". . . it will be necessary . . ."

[130]      Exhibit P-28.

[131]      Exhibit P-34.  This suggested resolution was made after Hanks had filed its suit, later dismissed.

These asserted resolutions were consistently rejected by Shore, while also offering to afford Hanks "an additional opportunity to review the royalty records."[132]

None of the proffered solutions to address the royalty issue advanced by Hanks are provided for in the PSA.  Rather, in the absence of the timely assertion of a valid "defect in title," the PSA confers options only upon the Seller, not the Purchaser.[133] It is not within the province of the court to rewrite the contract for the parties.[134]

As noted above, there was no communication between the parties between November 9, 1995,[135] and December 17, 1996,[136] which certainly justified a conclusion on the part of the Seller that "the deal was off."

Were it to be contended that a proper construction of the PSA would authorize the Purchaser, in its sole discretion, to suspend the obligation to close the transaction indefinitely [or, if not indefinitely, at least for a sufficient period of time, commensurate with the law of liberative prescription, as to cure the perceived (in the mind or belief of the Purchaser only) defect in the payment of royalties], this would result in an absurd consequence, a result not to be countenanced under Louisiana

---

[132]  Exhibit P-29.  See also Exhibit P-31.

[133]  Tr. II p. 15, l. 18-24.

[134]  "It is not within the province of the court to alter or make new contracts for the parties, its duty being confined to the interpretation of the agreements between the parties, and in the absence of any ground for denying enforcement, to render them effective.  *Texas Co. v. State Mineral Board*, 216 La. 742, 44 So.2d 841 (1949)."  *Bown v. Austral Oil Company, Incorporated*, 322 So.2d 866 (La.App. 3rd Cir. 1975), *writ denied* 326 So.2d 370 (La. 1976).

[135]  Exhibit P-48.

[136]  Exhibits P-49 and 50.

law.[137]   Such a result would mean that the Purchaser would get the benefit of all operations and production after the Effective Date,[138] while the Seller would only receive the Purchase Price without any interest being due thereon.[139]   Given the risk and uncertainty in the oil and gas industry, this would result in an absurd – not to mention unjust – consequence.

By failing to close on October 7, 1994, Purchaser failed to comply with its obligations under the PSA to do so.  As the Supreme Court stated in *Pratt v. McCoy*:[140]

> A party seeking to compel the specific performance of a contract must himself show a specific performance with his own obligations.

---

[137]   "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  Article 2046, Louisiana Revised Civil Code.  See also *Amend v. McCabe*, 95-0316 (La. 12/1/95); 664 So.2d 1183 ("To determine the parties' intent, a court must look to the words and provisions of the contract first; when words and provisions are clear and explicit, no further interpretation may be made in search of the parties' intent, but, even when the language of a contract is clear, a court should refrain from construing the contract so as to lead to absurd consequences.").

[138]   Because the Purchaser was receiving reports from Amoco as to the expenses and revenues associated with the Field, it is reasonable to believe that the Purchaser would not seek specific performance if, after the Effective Date, the Field "went negative," either because of a catastrophe (blow-out, pipeline rupture, etc.), significant decline in production or commodity prices, or a significant increase in expenses.  While merely intended to demonstrate the "absurd consequence" which would otherwise result, this observation, although deemed logical, forms no part of this Report and Recommendation as the trial was bifurcated, (Doc. 151, ¶ 1) and, hence, no evidence of historic operations or production was presented at trial for purposes of consideration of a damages claim.

[139]   Conventional interest "must be fixed in writing; testimonial proof of it is not admitted in any case."  La. R.S. 9:3500C(1).

[140]   128 La. 570, 54 So. 1012 (1911).

Similarly, more contemporary courts[141] have recognized that:

> A major requirement of one who seeks specific performance is proper performance of his part of the contract.   In the absence of proper performance, plaintiffs must prove they are and were ready to comply with whatever obligations devolved upon them to perform.

This principle is consistent with Louisiana's law of obligations.   A contract to sell is a bilateral contract whereby the parties undertake reciprocal obligations.[142] Significantly, in the case of reciprocal obligations, such as the obligations created under the PSA, the obligor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation.[143]

Having not asserted, on or before the stipulated date (September 27, 1994), a valid "defect in title," the Purchaser waived all defects not asserted.[144] At that point, the Purchaser was obligated to appear at the Closing on the Closing Date and conclude the transaction contemplated by the PSA.   By failing to do so, the Special Master determines that Shore had no further obligation to convey the Assets to the Purchaser.

---

[141] *Thompson v. Johnson*, 602 So.2d 272, 274 (La.App. 2nd Cir. 1992) Citing *Carmadelle v. Koch-Ellis Marine Contractors*, 420 So.2d 1029, 1031-32 (La.App. 5th Cir. 1982), *writ denied*, 427 So.2d 869 (La. 1982).

[142] Articles 2623 and 1908, Louisiana Revised Civil Code.

[143] Article 1993, Louisiana Revised Civil Code.

[144] "THE ABSENCE OF ANY SUCH NOTICE SHALL BE DEEMED A WAIVER OF SUCH DEFECTS, IF ANY, BY PURCHASER."  PSA, Article VI(a).  Exhibit P-10; Exhibit D-32.

**F.    Specific Performance as a Remedy for Alleged Breach of Contract to Convey Immovable Property:**

Notwithstanding this conclusion as reached by the Special Master, some consideration must be given to the appropriate response to Hanks' suit for specific performance.  In particular, consideration must be given – perhaps in the alternative to the conclusion reached above -- to whether the Purchaser is entitled to judicial relief in the form of specific performance as demanded by Hanks in its petition.

While Hanks did timely file a suit for specific performance,[145] it was, by agreement of the parties, held in abeyance during the period specified in the Standstill Agreement.[146]  Because that suit was ultimately dismissed without prejudice, it was as if it had never been filed in the first instance.[147]

By letters dated December 17, 1996,[148] Hanks informed Shore and its counsel that it intended "to reinstitute legal proceedings in the Twenty-First Judicial Court, Parish of Livingston, State of Louisiana seeking specific performance of the [PSA]."  The suit was in fact filed on December 19, 1994.[149]

---

[145]    Filed October 7, 1994.  Exhibit P-35.

[146]    Exhibit P-46.

[147]    "An interruption of prescription resulting from the filing of a suit in a competent court and in the proper venue or from service of process within the prescriptive period continues as long as the suit is pending.  Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses the action at any time either before the defendant has made any appearance of record or thereafter, or fails to prosecute the suit at the trial."  Article 3463, Louisiana Revised Civil Code.

[148]    Exhibits P-50 and P-51.

[149]    Doc. 1, pp. 5-9.

Louisiana law provides a liberative prescriptive period of ten (10) years on contract claims in general.[150]   However, although a period of prescription merely sets the outside date after which no suit can be filed,[151] it does not displace other rules of law which might operate to disallow an otherwise timely suit.   One such limitation is that applied by the courts to suits for specific performance of an agreement to sell.

The PSA executed between the parties constituted a bilateral promise. "Generally, a bilateral promise of sale or contract to sell that sets forth the thing, the price, and meets the formal requirements of the sale it contemplates, entitles either party to the agreement to demand specific performance."[152]   "While a sale is an executed contract, an agreement to sell is an executory contract."[153]   "A binding bilateral agreement for the sale of immovables is a contract to sell, and not a sale, unless the vendor has passed an act translative of title."[154]

Under Article 2623, Louisiana Revised Civil Code, either party has the right to demand specific performance to enforce a contract to sell.  That article states:

> An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the

---

[150]   "Unless otherwise provided by legislation, a personal action is subject to a liberative prescription of ten years."   Article 3499, Louisiana Revised Civil Code.  [Parenthetically, while it has no application to this suit (filed on December 19, 1996), Louisiana law now provides for a prescriptive period of five years for "[a]n action for the breach or other failure to perform a contract for the sale, exchange, or other transfer of an immovable . . ."  See La. R.S. 9:5645 as enacted by Acts 2006, No. 701, § 1, eff. August 15, 2007.].

[151]   "Liberative prescription is a mode of barring of actions as a result of inaction for a period of time."  Article 3447, Louisiana Revised Civil Code.

[152]   *Boudreaux v. Vankerkhove*, 07-2555 (La.App. 1st Cir. 8/11/08); 993 So.2d 725, 731.  See also Article 2623, Louisiana Revised Civil Code.

[153]   *Bounds v. Makar*, 85-763 (La.App. 3rd Cir. 8/21/86); 493 So.2d 268, 270.

[154]   *Id*.

happening of a condition, or upon performance of some obligation by either party, is a bilateral promise of sale or contract to sell.  Such an agreement gives either party the right to demand specific performance.  A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.

According to Comment (a) to Article 2623, "[t]his Article reproduces the substance of paragraph one of Article 2462 of the Louisiana Civil Code of 1870.  It does not change the law."

Courts, under former Article 2462, have declined to grant specific performance to compel the transfer of immovable property under certain circumstances, stating, as follows:

The right to demand specific performance is an equitable remedy afforded either the seller or purchaser.  However, it is essential that the party desiring specific performance to such an agreement must judicially demand the same within a reasonable time or be deemed to have abandoned their right to do so.[155]

More specifically, some courts have concluded that, under certain circumstances, an unreasonable delay in filing suit, the transfer of which is sought to be enforced by specific performance, will justify the denial of the right of specific perform-ance.[156]

--------

[155]    *Lambert v. Succession of DeHass*, 271 So.2d 910, 914 (La.App. 1st Cir. 1972). Citing *Port Arthur Towing Company v. Leveque*, 247 So.2d 595 (La.App. 3rd Cir. 1971); *Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909); *Schluter v. Gentilly Terrace Co.*, 164 La. 663, 114 So. 586 (1927); *Davis v. McCain*, 171 La. 1011, 132 So. 758 (1931); *Powell v. Codifer and Bonnabel, Inc.*, 167 La. 97, 118 So. 817 (1928).

[156]    *Hymel v. Old Homestead Inc.*, 135 So.2d 685 (La.App. 4th Cir. 1961). Citing *Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909); *Powell v. Codifer & Bonnabel, Inc.*, 167 La. 97, 118 So. 817 (1928); *Davis v. McCain*, 171 La. 1011, 132 So. 758 (1931); *Seeger v. Seeger*, 169 La. 611, 125 So. 732 (1928).

**G.**   **Time Within Which Specific Performance May be Sought**:

Even assuming that Purchaser was entitled to seek specific performance to require Shore to sell the Field, the Special Master concludes that it waited too long to institute its suit.

In *Joffrion v. Gumbel*,[157] the Louisiana Supreme Court reviewed a dispute arising out of an agreement to sell immovable property.  This agreement provided that the purchaser would receive title to the property in his name, but, at the seller's option, the purchaser was obligated to "transfer, sell, and deliver" an undivided one-half (1/2) interest in the property, back to the seller, for one-half (1/2) of the purchase price paid. At the time of the sale, the purchaser paid a sum of $ 502.50 for the property.

The seller, relying upon his contractual right to reacquire a one-half (1/2) interest in the land, made a number of improvements to the property.  However, the seller died before he could exercise his option to reacquire an interest in the property. Nearly eight years later, when the decedent seller's heirs demanded that the purchaser execute the terms of the agreement, the purchaser refused.  At the time of the suit, the property was valued at $8,000.   In stark contrast, the original price paid by the purchaser was $502.50.

The heirs brought suit and sought a judgment for specific performance.  In the alternative, the heirs asked the court to compel the purchaser to pay the cost of one-half (1/2) the value of the property, legal interest, and the cost of the improvements. The purchaser denied that the decedent seller ever acquired any ownership interest in

---

[157]     123 La. 391, 48 So.1007, 1008 (1909).

the land after the transaction.  The heirs admitted that the decedent seller never reac-
quired any interest in the land.  However, the heirs asserted that the decedent seller
had the right to buy and acquire a one-half (1/2) interest in the land upon payment of
one-half (1/2) of the cost, an option the heirs sought to invoke.

     The Louisiana Supreme Court held that the heirs could not avail them-
selves of the conditional right to purchase the property at the price agreed upon in the
document because that right was conditioned upon carrying out the obligation imposed
(the purchase by the seller of an interest in the land) within a reasonable time.  The
Louisiana Supreme Court refused to permit the heirs to "wait until values had changed
to the injury of the party proposing to sell."[158]  The court also noted that there had been
a significant change in the value of the property, and the heirs of the seller had
contributed nothing to that change in value.[159]

     In articulating the *Joffrion* decision, the Louisiana Supreme Court summa-
rized the general rules underlying specific performance, and stated the "well-recognized
rule," as follows:

> The general rule is that he who seeks performance of a
> contract for the conveyance of land must show himself
> ready, desirous, prompt, and eager to perform the contract
> on his part.  Therefore unreasonable delay in doing these
> acts which are to be done by him will justify and require a
> denial of relief.  No rule respecting the length of delay which
> will be fatal to relief can be laid down, for each case must
> depend on its peculiar circumstances.

---

[158] *Id.* at 1013.

[159] *Id.*

Furthermore, the court noted:

It is equally well settled that one who seeks specific perform-
ance of such a contract must institute his suit within a
reasonable time, and before any material change affecting
the interest of the parties has taken place.[160]

Finally, the court articulated the passage to be later cited in many

subsequent cases, to-wit:

It would be an unwarrantable exercise of discretionary power
to allow one holding a mere option to purchase to lie by for
so long a time and speculate upon the fluctuating values of
urban lots, and, after a substantial increase in their value, to
enforce a conveyance in his favor at the original price now
inadequate.[161]

The case of *Schluter v. Gentilly Terrace Co.*[162] involved a dispute sur-

rounding a bond for deed contract.  The parties' agreement stated that the purchaser

would be permitted to buy three lots for a sum of $1,800 to be paid by an initial payment

of fifty-dollars in cash and 117 promissory notes for the balance, payable monthly, on or

before the first day of each month.  The plaintiff alleged that he attempted to tender the

total amount due by him at the time on the deferred payments under the contract, and

the defendant refused to accept the tender and deliver to the plaintiff a deed.

The court concluded that the plaintiff violated his bond for deed contract

with the defendant company by failure to pay the monthly installment notes; deeming

the attempted tender made by the plaintiff both too late and insufficient.

---

[160]   Citing *Penrose v. Leeds*, 46 N.J. Eq. 294, 19 Atl. 134.

[161]   *Joffrion*, 48 So. at 1012.

[162]   164 La. 663, 114 So. 586, 588 (1927).

More significantly, the court noted that the plaintiff refused to make payments and persisted in the cancellation of his acceptance, up until the date of his attempted tender, at which time the value of the lots had increased.  The court stated that the "[p]laintiff cannot be permitted to play the role of 'watchful waiting' all of these years, without performing his obligation, and to reap, at this late date, the benefit of it in speculative values."[163]   The court then quoted *Joffrion* to buttress its holding.

In *Powell v. Codifer & Bonnabel*,[164] yet another case involving a contract styled a bond for deed, the plaintiff entered into an agreement with the defendant to purchase two lots in Jefferson Parish.  The agreement obligated the plaintiff to pay thirty-six consecutive monthly installments.  The plaintiff made irregular payments, and then ceased to pay altogether.  Subsequently, the plaintiff "simply dropped out of sight" until she instituted suit for specific performance of the contract.[165]

The Louisiana Supreme Court concluded that the plaintiff failed to comply with the conditions of the contract, and the defendants were permitted to sell the property.  Thus, the defaulting plaintiff could not enforce specific performance of the contract nor recover damages.

In yet another case,[166] the plaintiff tendered a written offer to purchase land to be held open for a limited duration.  This offer included an offer to purchase the land, with tools, stock, seed and feed, and a "walk out" proposition for the cash price of

---

[163]   *Id*. at 587.

[164]   167 La. 97, 118 So. 817 (La. 1928).

[165]   *Id*.

[166]   *Goudeau v. Daigle,* 37 F.Supp. 843 (La. E.D. 1941).

$5,000.[167]   The offer stipulated that, if the defendant's title were found invalid or so defective that it could not be validated within a reasonable time and at a reasonable expense, then the contract would be null and void.  The offer further stated that, if the contract was accepted, the plaintiff would be required to pay the remaining balance by a specified date or it would be forfeited.

The plaintiff in *Daigle* filed an action over eight years after the specific date upon which payment was due in order to "make good" the offer.  The court held that the plaintiff plainly abandoned the contract which he sought to revive.  More significantly, the court articulated the perceived unfairness which would result from a decision in the plaintiff's favor.  The court stated:

> Plaintiff cannot fairly be permitted to press the claim that he now seeks to urge against the present defendants.   The continued development of the Charenton oil field, which was brought in on September 6, 1936 -- after LeBlanc's death -- suggests that the new value now attaching to 'the property of Mr. Paul LeBlanc, East side Charenton' (as the offer to buy reads) in the mind of the plaintiff (who alleges himself to now be a citizen of the State of Texas) is probably a value entirely disassociated from that which led him to make his 'walk-out' offer to purchase, in 1931.

This jurisprudentially recognized limitation on the right to sue for specific performance is uniquely appropriate to the sale of producing oil and gas properties due to the speculative nature of such assets.[168]

---

[167]     *Id.* at 844.

[168]     Louisiana jurisprudence is replete with cases which acknowledge the speculative nature of oil and gas activities, often resulting in a refusal to award damages based upon "mere conjecture and speculation."  *See, e.g., Louisiana Gas & Fuel Company v. White Bros.*, 157 La. 728, 103 So. 23 (1925); *LeBleu v. Vacuum Oil Co.*, 15 La.App. 639, 132 So. 233 (La.App. 1st Cir. 1931); *McCoy v. Arkansas Natural Gas Co.*, 184 La. 101, 165 So. 632 (1936); *Ferguson v.*

As noted by one court:[169]

> The business of the exploration of minerals is highly speculative and capital intensive.  It involves the investment of hundreds of thousand of dollars, and the activity is extremely price sensitive.  Economic fluctuations can turn a lucrative investment one month into a financial fiasco the next.

Because the Special Master has determined that Hanks was not in compliance with its obligations under the PSA, and that, consequently, Shore had no further obligation to convey the Assets to the Purchaser, it is not necessary for the Special Master to conclude that Hanks was engaging in the practice of "watchful waiting," as any conclusion would be *obiter dictum*.  Rather, it is sufficient to state as an alternate view that, for the reasons stated herein, the Special Master would conclude that, even assuming that Hanks had a right to seek specific performance, the court should exercise its discretion to withhold a decree of specific performance.

---

*Britt*, 191 La. 371, 185 So. 287 (1938); *Fite v. Miller*, 196 La. 876, 200 So. 285 (1941); *Louisiana Gas Lands, Inc. v. Burrow*, 197 La. 275, 1 So.2d 518 (1941); *Ludeau v. Continental Oil Company*, 226 La. 1053, 78 So.2d 170 (1955); *Aladdin Oil Company, Inc. v. Rayburn Well Service, Inc.*, 202 So.2d 477 (La.App. 4th Cir.), *writ refused* 251 La. 388, 204 So.2d 573 (1967); *Veazey v. W. T. Burton Industries, Inc.*, 407 So.2d 59 (La.App. 3rd Cir.), *writ granted and case remanded for further proceedings* 412 So.2d 88 (1982), and *Coon v. Placid Oil Company*, 493 So.2d 1236 (La.App. 3rd Cir.), *writ denied* 497 So.2d 1022 (1986).

[169]   *Plaquemines Parish Government v. State Mineral Board*, 615 So.2d 1051, 1056 (La.App. 1st Cir.), *writ denied* 617 So.2d 934 (1993).

43

IV.    Proposed Findings of Fact

Based upon a thorough review of the record, the Special Master proposes the following Findings of Fact as being supported by the record,[170] as follows:

1.    On July 25, 1994, the then Shore Oil Company ("Shore") and J. B. Hanks Co., Inc. ("Hanks") entered into a Purchase and Sale Agreement (the "PSA") whereby Shore agreed to sell and Hanks agreed to purchase working and royalty interest in several oil and gas wells in the Lockhart Crossing Field, Livingston Parish, Louisiana (the "Field").

2.    The PSA had an effective date of July 1, 1994.

3.    The PSA called for Hanks to conduct "due diligence" and to provide Shore with notice of any alleged title defects within a specified time period.

4.    Under the PSA, closing of the transaction was contingent on all representations and warranties being true and correct and the satisfaction of any title defects.

5.    The closing date was eventually scheduled for October 7, 1994.

6.    Prior to the closing date, Hanks advised Shore that, in Hanks' opinion, a title defect existed which justified Hanks not closing on portion of the property covered by the PSA.

7.    Hanks' espoused concern was directed to one of the mineral leases (the "Miley Lease") applicable to the Miley No. 1 Well (the "Miley Well").

8.    Hanks asserted that the royalties or net profits interest were not being properly paid because they were being calculated based on an "entitlements" basis, as opposed to an "actual takes" basis, during times when all of the working interest owners were not taking all of their proportionate share of the natural gas being produced from the Miley Well.

9.    Shore was calculating royalties and net profits payments under the Miley Lease based on "entitlements."

---

[170]    Proposed Findings of Fact 1 through 18 have been stipulated by the parties, and are set forth as "Established Facts" in the Pre-Trial Order signed by counsel for the parties on August 19 and 20, 2003, and filed with the Court on August 20, 2003.  Doc. 102.  Those items have, in some instance, been modified or revised by the Special Master for clarity and consistency.

10.   Disagreeing with Hanks' contention that payment of the royalties or net profits interest on an "entitlements" (rather than an "actual takes") basis was improper, Shore was not willing to pay the royalties or net profits interest which Hanks claimed were due, but had not been paid.

11.   Hanks and Shore filed lawsuits against each other in Louisiana and Texas respectively on October 7, 1994.

12.   Hanks and Shore entered into a Standstill Agreement on November 14, 1994.

13.   Pursuant to the Standstill Agreement, both Hanks and Shore dismissed their respective lawsuits, without prejudice.

14.   To the date of commencement of the trial, the lessee under the Miley Lease had not received a "Formal Demand" from the lessors demanding payment of any underpaid royalties or net profits interest.

15.   There has never been a closing under the PSA.

16.   Shore was merged into Middle Bay Oil Company on January 1, 1998.

17.   Middle Bay Oil Company was merged into 3TEC, Inc. on December 7, 1999.

18.   3TEC, Inc. was merged into PXP Gulf Coast Inc. on June 4, 2003.

19.   For the quarter ending February 1994, the difference between the amount actually paid by Shore to the Miley Lessors, and the amount which Hanks contended was due, amounted to $86,386.00.

20.   The notice provided by Hanks to Shore of Hanks' contention was timely given as contemplated by the PSA.

21.   Pursuant to the PSA, upon a proper notice or assertion by Hanks of a "defect in title," Shore was entitled to elect one of the following remedies:  (1) remedy the material defect; (2) agree with Hanks on an adjustment of the Purchase Price; or (3) remove the asset subject to the defect from the Assets being conveyed.

22.   In October of 1994, Shore stated that the value of the "matters in dispute" was in the range of $35,000.00.

23.   Shore received letters from counsel for the Miley Lessors from November 2, 1995 through June 11, 1996 inquiring into the correctness of the calculation and payment of royalties or net profits interest to the Miley Lessors.

24.   Shore generated a spreadsheet which was provided to counsel for the Miley Lessors under a cover letter dated May 10, 1996.

25.   There was no correspondence between the parties after the date of November 9, 1995, until Hanks' counsel informed Shore and its counsel that the instant suit was to be filed, on or about December 17, 1996.

26.   The Lessors of the Miley Lease were either sophisticated in oil and gas matters, or certainly had competent legal representation who examined and scrutinized the issue of the proper methodology to calculate royalties or NPI under the Miley Lease.

27.   The PSA provided for an Effective Date of July 1, 1994, and that the closing would take place at Shore's offices in Houston, Texas on or before September 9, 1994 (the "Closing Date").

28.   Subsequently, the Closing Date was continued on more than one occasion, but was ultimately fixed for October 7, 1994.

29.   Hanks agreed to pay Shore a purchase price of $450,000.00 for all of Shore's right, title and interest in the Assets, and to deliver to Shore within two days of the date of execution of the PSA, a written schedule ("Purchase Price Allocation") allocating the Purchase Price among the various individual properties comprising the Assets in a manner consistent with their respective values.

30.   Shore agreed to "warrant and defend title to the Assets assigned . . . against lawful persons claiming by, through or under Shore, but not otherwise."

31.   Shore agreed to allow Hanks access to examine title and certain business records of Shore described in Article IX of the PSA which relate to the operation or ownership of the Assets (the "Documents") at Shore's office in Houston.

32.   Some of the Assets were subject to "preferential rights to purchase" in favor of third parties.  The rights were exercised and the affected Assets were removed from the transaction, resulting in a reduction of the Purchase Price to $437,500.00.

33.   Hanks agreed to notify Shore no later than twelve noon, central time, July 27, 1994, of any material defects in title, percentage interest, or deficiency in the Documents discovered by Hanks, and which relate to any Assets not subject to preferential rights to purchase.

34.   Hanks was provided a period of fourteen (14) days from the receipt of written notification from Shore advising that third parties holding preferential rights to purchase all or a portion of the Assets had declined or failed to timely exercise

such rights, within which to examine title and the Documents which relate to the leases previously affected by such preferential rights to purchase.

35.   No later than 5:00 p.m. central time, on the 14th day following receipt of such notification by Hanks, Hanks was obligated to notify Shore of any material defects in title, percentage interest, or deficiency in the Documents discovered by Hanks.

36.   The terms "defect in title" and "deficiency in the Documents" were not defined in the PSA.

37.   For purposes of the PSA, a defect was to be considered "material" only if it would cost in excess of $5,000.00 to eliminate the defect.

38.   The PSA provides that, within ten days after receipt of timely notice of a material defect, Shore may take any steps it believes are reasonable in attempting to eliminate such material defects.

39.   There is no express obligation in the PSA on the part of Shore to remedy or cure any material defect.

40.   Under the PSA, with limited exceptions not applicable in this case, Shore retained all risk and liability of whatsoever nature connected with operations conducted on the Assets up to and including the Effective Date, and agreed to indemnify, defend and hold Hanks harmless from all liabilities, penalties, claims, causes of action, demands, lawsuits, and expenses associated with the operations up to and including the Effective Date.

41.   Hanks agreed to assume all risk and liability of whatsoever nature connected with operations conducted on the Assets after the Effective Date, and agreed to indemnify, defend and hold Shore harmless from all liabilities, penalties, claims, causes of action, demand, lawsuits, and expenses associated with the operations after the Effective Date.

42.   The PSA expressly provided that all accounts payable, royalties, severance taxes and other costs and expenses with respect to Shore's interest in the Assets which relate to the period prior to the Effective Date would be the obligation of and be paid by Shore, and those which related to the period commencing with the Effective Date would be the obligation of and be paid by Hanks.

43.   The PSA provided that the sale of the Assets shall be subject to and Hanks would assume, pay for and perform the duties, liabilities, and obligations relating to the Assets, including but not limited to, all applicable and validly recorded and unrecorded agreements, contracts, and instruments (including but not limited to royalties, overriding royalty interests, production payments, net profits interest, carried working interest or similar burdens).

47

44.     One of the contracts relating to the Assets was a Gas Balancing Agreement ("GBA") between Shore Oil Company, a non-operating working interest owner, and Amoco Production Company, the operating working interest owner ("Operator").

45.     Under the PSA, Hanks expressly assumed any liability and obligation for gas imbalances (whether over or under) attributable to the working interest to be acquired under the PSA as of the Effective Date.

46.     The PSA expressly provided that it constituted the entire agreement between Shore and Hanks with respect to the transactions contemplated therein, and superseded all prior oral or written agreements, commitments, understandings, or information otherwise furnished by Shore to Hanks with respect to such matters.

47.     No amendment to the PSA would be binding unless in writing and signed by representatives of both parties.

48.     This method of paying royalties, based upon each working interest owner's allocable share of gas production in each royalty period, rather than the actual volume taken in each royalty period, is known as the "entitlements" method of paying royalties.   In other words, the working interest owner pays the royalty owner the royalty or net profits to which his percent ownership in the unit "entitles" him to receive.

49.     No provision(s) of the leases prohibit the payment of royalties on an "entitlements" basis.  While the lease is silent on how royalties should be paid where there is ownership in indivision of production from the well due to co-ownership of lease interests (multiple co-lessees) or unitization by the regulatory agency (Louisiana Department of Natural Resources, Office of Conservation), it does provide an example for how royalties should be paid in another situation involving ownership in indivision of production – voluntary pooling or unitization.

50.     The Miley Lease specifically provides that, where there is voluntary pooling or unitization, royalties are to be computed "only on the proportionate part of the production from any pooled unit that is allocated to the land herein described."  In other words, royalties are to be paid based upon "entitlements."  Thus, the Miley Lease does contemplate that royalties may be paid on an "entitlements" basis in a situation where there is ownership in indivision of production.

51.     The GBA also provided that any party transferring its interest, or any part thereof, shall give notice of the GBA to any transferee, and such transfer shall not be binding upon the parties until such transferee has agreed in writing to be bound by the terms of GBA.

52.   The proposed Assignment and Bill of Sale attached as Exhibit "B" to the PSA provides for the assignment of "any contracts or agreements . . . insofar as same pertain to operations conducted on the Leases . . . ."

53.   Thus, the assignment of the GBA to Hanks [and the resulting assumption of its obligations by Hanks] was contemplated.

54.   Under accepted industry, accounting and regulatory standards, either method of paying royalties, based upon "entitlements" or based upon "actual takes" is acceptable.

55.   On June 20, 1994, Shore and Hanks entered into a Confidentiality Agreement by which Hanks agreed, among other things, that (i) it would not use the information provided by Shore for any purpose other than for evaluation and purchase of Shore's interest in the Field, and (ii) it would not disclose any Confidential Information to any person or entity.

56.   Pursuant to the terms of several Confidentiality Agreements signed by Hanks, Hanks was not permitted to discuss the royalty payment issue with the Miley Lessors.

57.   Hanks held certain interests in the Field and, hence, had a general understanding of the Field and received certain reports from Amoco, the operator of the Field, with regard to revenue and expenses associated with production from the Field, including the amount of gas which a working interest owner is entitled to take, as well as the actual amount taken by such owner.

58.   By letter dated September 23, 1994, Hanks notified Shore that Shore had failed to pay proper royalties to its mineral lessors, and that the failure to pay proper royalties is "a default under the terms of each and every lease."

59.   Hanks took the position that the alleged improper payment of royalties constituted a "defect in title" or "deficiency in Documents."

60.   The basis of Hanks' claim was that Shore had improperly paid royalties to lessors on an "entitlements" basis rather than an "actual takes" basis.

61.   Shore's counsel responded to Hanks' counsel in writing on September 27, 1994, denying that payment of royalties based on "entitlements" constituted a breach of any of the leases at issue and advising that (i) the "entitlements" method for paying royalties was required by the GBA and as of that date, Shore had not received any complaint from any royalty owners; (ii) Hanks agreed to be bound by the GBA ; and (iii) the GBA  provided that a transfer [of any mineral lease affected by the GBA ] would not be binding upon the parties until such transferee had agreed in writing to be bound by the terms of the GBA.   Shore stated that it

expected Hanks to comply with the GBA and all other such agreements after the closing of the pending transaction.

62.   On that same date, counsel for Hanks wrote counsel for Shore again alleging that Shore "is currently in default on all of the mineral leases which form the subject assets of the Purchase and Sale Agreement."   Counsel further asserted that the GBA is "irrelevant."

63.   On September 30, 1994, Shore's counsel responded to Hanks' counsel's letter of September 27, 1994 by reiterating that Shore disagreed with the assertion that Shore was "in default on all of the mineral leases" which form the subject assets of the PSA, and that the GBA bound its parties to pay on an "entitlements" basis. He points out that Shore has not been put in default by any royalty owner, and reminds Hanks of a provision of the Miley lease stating that royalties are to be computed "only on the proportionate part of the production from any pooled unit that is allocated to the land herein described."   Shore's counsel states that Shore is prepared to proceed to closing but is not willing to permit Hanks to deduct any amount from the agreed purchase price with respect to the royalty issues Hanks alleges exist.   He advises that, if Hanks is unwilling to proceed to close on this basis, in accordance with Article IV of the PSA, Shore is entitled to and shall remove the Assets affected by the defects Hanks has asserted to exist from the Assets being conveyed and adjust the purchase price accordingly.   If Hanks refuses to close on that basis, Shore shall elect from among other remedies and alternative courses of action available to it under the PSA and at law.

64.   On October 4, 1994, counsel for Hanks wrote counsel for Shore advising that Hanks does not agree with Shore's position on the proper payment of royalties and that he does not see a way to resolve the situation, short of "accepting the position of Shore Oil Company . . . that the Miley well interest be removed in accordance with Article IV" of the PSA.

65.   On October 6, 1994, Shore's counsel responded to counsel for Hanks, advising that the statement in his September 30th letter that Shore would remove the "Assets affected by the defects Hanks has asserted to exist" was based upon the assertion in counsel for Hanks' letter of September 27th, that "Shore is currently in default on all of the mineral leases" which form the subject of the Assets of the PSA, together with statements made to Mr. Herod of Shore by Mr. Hanks, that Shore was in default on all of the leases (at least all those where royalties were paid on an "entitlements" basis).   He reminded counsel for Hanks that the PSA permits Shore, not Hanks, to demand the transaction proceed in accordance with any of the options set out in Article IV of the PSA.   He states that since it is apparent that Hanks does wish to avail itself of the opportunity given in its letter of September 30, 1994 to proceed to closing without removing any properties which it alleges to be defective from the transaction, Shore reiterates that the defects asserted are baseless, and demand that Hanks close in accordance with the terms of the PSA for all properties without adjustment to the Price.

66. On October 7, 1994, counsel for Hanks responded, indicating that Hanks will not proceed to closing on October 7, 1994 due to the fact that Mr. Herod, of Shore would not be able to be present.

67. In fact, Shore was prepared to close and had an authorized representative prepared to sign the closing documents.

68. Shore's attorney responded to Hanks' October 7th letter on the same date, stating that, if Mr. Hanks wishes to close the PSA as to all the properties, Shore would be pleased to extend the Closing Date until October 11, 1994 and will have an authorized agent or officer at the closing to execute and deliver the closing documents.

69. Shore was ready, willing and able to close on the Closing Date (October 7, 1994).

70. Hanks failed to close on the Closing Date.

71. On October 7, 1994, Shore filed a Declaratory Judgment action in the 127th Judicial Court of Harris County, Texas, asking the court to declare the rights of the parties under the PSA.

72. An hour and fourteen minutes later, on the same day, Hanks filed suit against Shore in the 21st Judicial District Court of Livingston Parish, Louisiana, alleging breach of contract and seeking specific performance.

73. The parties did not pursue the litigation, electing instead to execute a Standstill Agreement, dated November 14, 1994, pending settlement discussions.

74. The parties agreed to allow Shore additional time to examine documents relating to payment of royalties and each agreed to dismiss their pending lawsuits without prejudice.

75. Hanks agreed not to reinstitute or refile a lawsuit against Shore during the term of the Standstill Agreement and thereafter to refile only after it has provided Shore with advance written notice of intent to institute such lawsuit, and then only on the second business day after the receipt of such notice by Shore.

76. No settlement was reached and the Standstill Agreement expired by its own terms on November 30, 1994.

77. There were no further discussion between Shore and Hanks concerning this matter subsequent to November, 1995.

78.   On or about November 2, 1995, Shore and its co-lessees received a letter from the Miley's attorneys asking questions about the lease covering the Miley No. 1 Well.  The letter expressly states that they do not "at this time consider there to be an adversarial issues."   The letter states that a question has arisen concerning net profits accounting for the period from December 1993 through February 1994.  Particularly, the letter states that it is not clear whether the net profits payment were made accurately reflected the value of the actual gas delivered.

79.   Shore responded on December 12, 1995, acknowledging receipt of the letter, providing partial answers and stating that it was Shore's intention to provide a detailed response in the next 30 days.

80.   Shore further responded on January 24, 1996, providing additional answers and expressly advising that Shore has always computed royalties due on gas production based on the "entitlements" method, not the cash or sales method, and stating its position that this is the correct procedure, from both an accounting standpoint as well as under the terms of the lease.

81.   The Miley's attorney responded on February 19, 1996, stating that he believed he understood the method by which royalties and net profits payments have been made in the past, but asking for some additional information so that he can make a better judgment as to whether they agree as to that methodology.  The letter expressly states "[i]t is our general belief that so long as the payments are made consistently, royalty paid on either entitlements or deliveries are appropriate under the terms of the lease, or at least are not objectionable."  The Miley's attorney questions the use of "entitlements" accounting for determining net profits interest, but recognizes that additional information regarding calculations of net profits during periods of underproduction must be considered.   The Miley's attorney concludes by stating that the letter is intended to be an inquiry into the method by which payments have been made and that they have not reached any conclusion at this time as to whether any underpayment has occurred.

82.   By letter dated March 21, 1996, Shore responded to the February 19, 1996, advising that Shore was in the process of gathering information for a response and hoped to reply by mid-April.

83.   On April 29, 1996, Shore again wrote to the Miley's attorney advising that they had some difficulty locating certain information related to the subject, but have now obtained the needed data and that a response may be expected by the end of the next week.

84.   On May 10, 1996, Shore wrote the Miley's attorney stating Shore's position that the royalties due on gas production should be computed on the "entitlements" method, not the sales or "actual takes" method, for both the 48% royalty as well as the 55% net profits provision of the lease.

52

85.   On May 13, 1996, the Miley's attorney responds, stating that he recognizes that the "entitlements" method used by Shore is sometimes used, and "at this point," he is not taking any position with regard to its correctness.  He comments further about the use of the "entitlements" method to calculate net profits, believes it will have to be resolved and requests that Shore address it with its counsel.  Shore never heard again from the Miley'' attorney.

86.   At no time, either before or after the Effective Date of the PSA, did any of Shore's mineral lessors ever make formal notice of underpayment of royalties.

87.   Hanks dismissed the Louisiana lawsuit on January 3, 1996.

88.   On December 17, 1996, Hanks advised Shore of its intent to reinstitute legal proceedings in Livingston Parish, Louisiana seeking specific performance of the PSA.

89.   Hanks filed this suit in the 21st Judicial District Court, Livingston Parish, Louisiana on December 19, 1996.  This case was removed to Federal court.

        To the extent that any of the foregoing are, or should be, more properly characterized as proposed conclusions of law, they are adopted as such.

## V.        Proposed Conclusions of Law

        Based upon a thorough review of the record, and the conduct of such research as deemed necessary or appropriate, the Special Master proposes the following Conclusions of Law as being supported by the record and applicable law, as follows:

1.    Mineral leases are real rights.

      Authority:

      Article 16, Louisiana Mineral Code.

2.    Mineral leases are immovable property.

      Authority:

      Article 18, Louisiana Mineral Code.

3.   The assignment of a mineral lease is manifestly the sale of an incorporeal thing or right.

   Authority:

   *Tomlinson v. Thurmon*, 189 La. 959, 181 So. 458 (1938).

4.   The transfer of ownership or an interest in a mineral [lease] cannot be the subject of a verbal agreement; it must be evidenced by a written contract and cannot be proved by parol evidence.

   Authority:

   *Billingsley v. Bach Energy Corporation*, 588 So.2d 786 (La.App. 2nd Cir. 1991).

5.   When a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit.

   Authority:

   *Maloney v. Oak Builders, Inc.*, 256 La. 85, 235 So.2d 386 (1970).
   *Cashio v. Shoriak*, 481 So.2d 1013, 1015 (La. 1986).

6.   Courts are bound to give legal effect to all contracts, according to the true intent of the parties, and the intent is to be determined by the words in the contract when they are clear and explicit and lead to no absurd consequences.

   Authority:

   Articles 2045 and 2046, Louisiana Revised Civil Code.
   *Foret v. Louisiana Farm Bureau Casualty Insurance Company*, 582 So.2d 989, 991 (La.App. 1st Cir. 1991).
   *Ransom v. Camcraft, Inc.*, 580 So.2d 1073, 1077 (La.App. 4th Cir. 1991).
   *Massachusetts Mutual Life Insurance Company v. Nails*, 549 So.2d 826, 832 (La. 1989).
   *Borden, Inc. v. Gulf States Utilities Company*, 543 So.2d 924, 927 (La.App. 1st Cir.), *writ denied* 545 So.2d 1041 (La. 1989).
   *Schroeter v. Holden*, 499 So.2d 309, 311 (La.App. 1st Cir. 1986).

7.   Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom.

Authority:

*Kean v. Lemaire*, 451 So.2d 151, 153-54 (La.App. 1st Cir. 1984).

8.    Freedom of contract' signifies that parties to an agreement have the right and power to construct their own bargains.  In a free enterprise system, parties are free to contract except for those instances where the government places restrictions for reasons of public policy.

Authority:

*Louisiana Smoked Products, Inc. v. Savoie Sausage and Food Products, Inc.*, 96-1716, 96-1727 (La. 7/1/97); 696 So.2d 1373, 1380.

9.    Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

Authority:

Article 2047, Louisiana Revised Civil Code.
*Lloyds of London v. Transcontinental Gas Pipe Line Corporation*, 101 F.3d 425 (5th Cir. 1996).

10.   Merchantable title is one that can be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and questions involved.

Authority:

*Young v. Stevens*, 209 So.2d 25, 27 (La. 1967).
*Parker v. Machen*, 567 So.2d 739 (La.App. 2nd Cir. 1990).

11.   Title is unmerchantable when it is suggestive of litigation.

Authority:

*Marsh v. Lorimer*, 164 La. 175, 113 So. 808 (1927).
*Sanders v. Rudd*, 427 So.2d 1271, 1275 (La.App. 2nd Cir. 1983).

12.   "Merchantable" implies something less than a perfect title and permits defects that are not reasonably liable to result in assault.

Authority:

*Langford Land Co. v. Dietzgen Corp.*, 352 So.2d 386, 388 (La.App. 4th Cir. 1977).

*Toler v. Pacific Int'l Petroleum, Inc.*, 465 So.2d 925, 927 (La.App. 2nd Cir.), *writ denied* 468 So.2d 1210 (La. 1985).

13.   When there is a reasonable possibility that a third person has an outstanding claim to all or part of the property, the title cannot be considered merchantable.

Authority:

*Schaub v. O'Quin*, 214 La. 424, 38 So.2d 63, 65 (1948).

14.   To render a title unmerchantable because of outstanding claims of third persons, the claims must be substantial in nature thereby subjecting the purchaser to serious litigation.

Authority:

*Kay v. Carter*, 243 La. 1095, 150 So.2d 27, 29 (1963).

15.   A title does not become unmerchantable simply because a reputable attorney might question certain aspects of it as imperfect.

Authority:

*Pesson Plumbing and Heating Co. v. Hammonds*, 160 So.2d 769, 772 (La.App. 3rd Cir. 1964).

16.   A title to property is merchantable when the title can be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and apprised of the questions involved.

Authority:

*Deleon v. WSIS, Inc.*, 31,602 (La.App. 2nd Cir. 2/26/99); 728 So.2d 1046, 1049.

17.   Although the title need not be free from every technical defect, suspicion, or possibility of litigation, it must be free of rational substantial doubt to the extent that a purchaser should feel that he can hold his purchase in peace without the probability of attack and with reasonable assurance that it will be readily salable on the open market.

Authority:

*Deleon v. WSIS, Inc.*, 31,602 (La.App. 2nd Cir. 2/26/99); 728 So.2d 1046, 1049.

18.     Title does not become unmerchantable merely because litigation is possible, but only when the title is reasonably suggestive of future litigation.

        Authority:

        *Bart v. Wysocki*, 558 So.2d 1326, 1328-29 (La.App. 4th Cir. 1990).

19.     It is well settled that custom of the place and the usual and customary manner of fulfilling like contracts is persuasive in determining the intention of the parties under a contract not specific in its wording.

        Authority:

        *Par-Co Drilling, Inc. v. Franks Petroleum Inc.*, 360 So.2d 642 (La.App. 3rd Cir. 1978).

20.     A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

        Authority:

        Article 2053, Louisiana Revised Civil Code.
        *Davis v. Laster*, 242 La. 735, 138 So.2d 558 (1962).

21.     It is not within the province of the court to alter or make new contracts for the parties, its duty being confined to the interpretation of the agreements between the parties, and in the absence of any ground for denying enforcement, to render them effective.

        Authority:

        *Texas Co. v. State Mineral Board*, 216 La. 742, 44 So.2d 841 (1949).
        *Bown v. Austral Oil Company, Incorporated*, 322 So.2d 866 (La.App. 3rd Cir. 1975), *writ denied* 326 So.2d 370 (La. 1976).

22.     The Louisiana Mineral Code sets forth the procedure for the assertion of a claim by a lessor for unpaid or improperly paid royalties, including the necessity for a written notice of non-payment as a prerequisite to dissolution of the mineral lease.

        Authority:

        Articles 137-42, Louisiana Mineral Code.

23. In a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice.

   Authority:

   Article 141, Louisiana Mineral Code.

24. Where there is a legitimate dispute between the lessor and the lessee relative to a clause in the lease and there are grounds for honest doubt as to the rights of the parties, a court will not, penalize a litigant lessee by dissolving a lease held technically in default when there is a *bona fide* defense.

   Authority:

   *Rudnick v. Union Producing Co.*, 209 La. 943, 25 So.2d 906 (1946).

25. Liberative prescription is a mode of barring of actions as a result of inaction for a period of time.

   Authority:

   Article 3447, Louisiana Revised Civil Code.

26. An action to recover underpayments of royalties from the production of minerals is subject to a liberative prescription of three years.

   Authority:

   Article 3494(5), Louisiana Revised Civil Code.
   *Board of Commissioners of Caddo Levee District v. Pure Oil Co.*, 167 La. 801, 120 So. 373 (1929)
   *Parker v. Ohio Oil Co.*, 191 La. 896, 186 So. 604 (1939).
   *Hankamer v. Texaco, Inc.*, 387 So.2d 1251 (La.App. 1st Cir.), *writ granted* 392 So.2d 669 (La. 1980), *case dismissed* 403 So.2d 651 (La. 1981).

27. An interruption of prescription resulting from the filing of a suit in a competent court and in the proper venue or from service of process within the prescriptive period continues as long as the suit is pending.  Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses the action at any time either before the defendant has made any appearance of record or thereafter, or fails to prosecute the suit at the trial.

Authority:

Article 3463, Louisiana Revised Civil Code.

28.   Generally, a bilateral promise of sale or contract to sell that sets forth the thing, the price, and meets the formal requirements of the sale it contemplates, entitles either party to the agreement to demand specific performance.

Authority:

*Boudreaux v. Vankerkhove*, 07-2555 (La.App. 1st Cir. 8/11/08); 993 So.2d 725, 731.
Article 2623, Louisiana Revised Civil Code.

29.   While a sale is an executed contract, an agreement to sell is an executory contract.

Authority:

*Bounds v. Makar*, 85-763 (La.App. 3rd Cir. 8/21/86); 493 So.2d 268, 270.

30.   A binding bilateral agreement for the sale of immovables is a contract to sell, and not a sale, unless the vendor has passed an act translative of title.

Authority:

*Bounds v. Makar*, 85-763 (La.App. 3rd Cir. 8/21/86); 493 So.2d 268, 270.

31.   A party seeking to compel the specific performance of a contract must himself show a specific performance with his own obligations.

Authority:

*Pratt v. McCoy*, 128 La. 570, 54 So. 1012 (1911).

32.   A major requirement of one who seeks specific performance is proper performance of his part of the contract.  In the absence of proper performance, plaintiffs must prove they are and were ready to comply with whatever obligations devolved upon them to perform.

Authority:

*Thompson v. Johnson*, 602 So.2d 272, 274 (La.App. 2nd Cir. 1992).
*Carmadelle v. Koch-Ellis Marine Contractors*, 420 So.2d 1029, 1031-32 (La.App. 5th Cir. 1982), *writ denied*, 427 So.2d 869 (La. 1982).

33.   A contract to sell is a bilateral contract whereby the parties undertake reciprocal obligations.

   Authority:

   Articles 2623 and 1908, Louisiana Revised Civil Code.

34.   In the case of reciprocal obligations, the obligor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation.

   Authority:

   Article 1993, Louisiana Revised Civil Code.

35.   An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon performance of some obligation by either party, is a bilateral promise of sale or contract to sell. Such an agreement gives either party the right to demand specific performance. A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.

   Authority:

   Article 2623, Louisiana Revised Civil Code.

36.   The right to demand specific performance is an equitable remedy afforded either the seller or purchaser.  However, it is essential that the party desiring specific performance to such an agreement must judicially demand the same within a reasonable time or be deemed to have abandoned their right to do so.

   Authority:

   *Lambert v. Succession of DeHass*, 271 So.2d 910, 914 (La.App. 1st Cir. 1972).
   *Port Arthur Towing Company v. Leveque*, 247 So.2d 595 (La.App. 3rd Cir. 1971).
   *Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909).
   *Schluter v. Gentilly Terrace Co.*, 164 La. 663, 114 So. 586 (1927).
   *Davis v. McCain*, 171 La. 1011, 132 So. 758 (1931).
   *Powell v. Codifer and Bonnabel, Inc.*, 167 La. 97, 118 So. 817 (1928).

37.   An unreasonable delay in filing suit seeking specific performance of a contract to sell immovable property will, under certain circumstances, justify the denial of the right of specific performance.

Authority:

*Hymel v. Old Homestead Inc.*, 135 So.2d 685 (La.App. 4th Cir. 1961).
*Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909).
*Powell v. Codifer & Bonnabel, Inc.,* 167 La. 97, 118 So. 817 (1928).
*Davis v. McCain*, 171 La. 1011, 132 So. 758 (1931).
*Seeger v. Seeger*, 169 La. 611, 125 So. 732 (1928).

38.   The general rule is that he who seeks performance of a contract for the conveyance of land must show himself ready, desirous, prompt, and eager to perform the contract on his part.  Therefore unreasonable delay in doing these acts which are to be done by him will justify and require a denial of relief.  No rule respecting the length of delay which will be fatal to relief can be laid down, for each case must depend on its peculiar circumstances.

Authority:

*Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909).

39.   One who seeks specific performance of a contract to sell immovable property must institute his suit within a reasonable time, and before any material change affecting the interest of the parties has taken place.

Authority:

*Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909).

40.   It would be an unwarrantable exercise of discretionary power to allow one holding a mere option to purchase to lie by for so long a time and speculate upon the fluctuating values of urban lots, and, after a substantial increase in their value, to enforce a conveyance in his favor at the original price now inadequate.

Authority:

*Joffrion v. Gumbel*, 123 La. 391, 48 So. 1007 (1909).

        To the extent that any of the foregoing are, or should be, more properly

characterized as proposed findings of fact, they are adopted as such.

VI.     <u>Recommended Ruling</u>

Based upon the foregoing, the Special Master recommends that judgment be rendered herein in favor of Defendant, PXP Gulf Coast, Inc., and against Plaintiff, J. B. Hanks Co., Inc., dismissing the Complaint of Plaintiff, and the legal demands therein contained, with prejudice.

SIGNED this 8th day of August, 2013.


_____
PATRICK S. OTTINGER
Special Master

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 8, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System.  Notice of this filing will be sent to counsel of record by operation of the court's electronic filing system. Additionally, a paper copy of this Report and Recommendation was sent to counsel of record via United States Mail, Certified Mail, Return Receipt Requested, and a copy was delivered to Chambers of the Honorable Brian A. Jackson, Chief Judge, United States District Court, Middle District of Louisiana.

_____
PATRICK S. OTTINGER